**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-139-BAH-2** |
| **DAVID WORTH BOWMAN,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court depart or vary upwards to sentence David Worth Bowman to 15 months of incarceration; three years of supervised release; $2,000 in restitution; and a $180 mandatory special assessment.

### I.        INTRODUCTION

The defendant, David Worth Bowman was one of the few rioters who entered the Senate floor during his participation in the January 6, 2021 attack on the United States Capitol. That violent attack forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

On January 6, 2021, Bowman, a part-time college student, marched down Pennsylvania Avenue to the U.S. Capitol building, climbed through scaffolding on the northwest side of the Capitol, and unlawfully entered the Capitol through the Senate Wing Door at 2:23 p.m., fewer than 10 minutes after it had been violently breached. Together with his friend and co-defendant, Christopher Carnell, Bowman spent the next 33 minutes as part of the mob that laid siege to the Capitol. They joined the crowd in the Crypt as it overwhelmed USCP officers who were trying to prevent the rioters from entering further into the Capitol. They then traveled into and through the Capitol Rotunda and joined a crowd that amassed near the Rotunda Door as the door was violently breached. Bowman and Carnell ascended the Rotunda Lobby East Stairs and observed other rioters physically attacking a female journalist. Then, at 2:49 p.m., they entered the Senate Chamber–representing two of only around 70 rioters who invaded the Senate floor. While they were on the Senate floor, Bowman took and posed for cell phone pictures and videos and observed rioters rifling through papers on Senators' desks. Bowman also took a paper drink coaster, bearing the seal of the United States Senate, from a desk on the Senate floor, and brought the coaster home as a souvenir. Two days later, Bowman three times asked a group of friends (including Carnell) to delete a text chain in which he discussed entering the Capitol Building. Bowman deleted images from his own cell phone approximately one year after January 6, 2021.

The government recommends that the Court sentence Bowman to 15 months of incarceration. A 15-month sentence reflects the gravity of Bowman's conduct, but also

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

acknowledges his early cooperation with the government, admission of the facts supporting conviction in a stipulated trial, his youth at the time of the offenses, and his lack of criminal history.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the agreed Statement of Facts for Stipulated Trial filed in this case, ECF No. 76-2 at 3-5, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Bowman's Role in the January 6, 2021 Attack on the Capitol

David Bowman lived in Raleigh, North Carolina. In the months and days leading up to January 6, 2021, Bowman, his co-defendant, Christopher Carnell, and other individuals, including Aiden Henry Bilyard (collectively, the "group"),[2] belonged to a text message chain that discussed politics and election fraud, among other things. In or around November 9, 2020, the group began discussing plans to go to Washington, D.C. for a "Stop the Steal"-related rally, the "Million MAGA March," set to take place on November 14, 2020. As the group discussed logistics for their November trip to D.C., including whether there would be law enforcement checkpoints set up along the route to D.C., the tenor of the chain turned to contemplated violence. Although the group members later attempted to make light of the discussion, after one group member said, "I'll bring

---

[2] Bilyard was convicted by plea agreement of violating 18 U.S.C. § 111(a)-(b) in *United States v. Bilyard*, No. 22-cr-34 (RBW).

my unlicensed firearm[,]" Bowman responded by sending the following two picture texts to the chain:



*Images 1, 2: Picture text of Bowman (holding firearm) and picture text of photo of a number of firearms.*

Another group member then responded, "chris who is this," to which Carnell said, "Good man named David don't worry about it[.]" When another member asked, "Are you planning on bringing those?" Carnell responded, "No lmao[3] it's a joke[.]"

Then, just over one month later, on December 21, 2020, Carnell sent a text message to the group that forwarded a message from an individual identified as, "[Name Redacted], Stop the Steal." The message advertised an event planned for January 6, 2021 and stated:

> January 6th is going to be HISTORIC. It's the day We the People will take to the steps of our nation's Capitol and demand they represent us! It's up to us to flood

---

[3] "LMAO" is an acronym used to abbreviate the phrase "laughing my ass off."

Washington D.C. with Patriots who will loudly tell Congress #DoNotCertify on #Jan6!

Congress has ignored us for far too long, but what they cannot ignore is hundreds of thousands of Patriots rallying outside the halls of Congress. This will send the message that we stand with Rep. Mo Brooks and his colleagues in the House of Representatives.

On January 3, 2021, Carnell texted the group, "January 6 DC trip you guys coming? Me and David are down, we should probably leave earlier this time like 4 am." The "David" referenced is defendant Bowman.

During the early morning of January 6, 2021, Bowman traveled from North Carolina to Washington, D.C. with Carnell in order to attend a rally at the Ellipse that featured speeches from individuals including former President Donald Trump.



*Image 3: Bowman (wearing sunglasses) and Carnell (wearing red baseball cap) at "Stop the Steal" Rally.*

After attending the rally, Bowman and Carnell walked down Pennsylvania Avenue toward the Capitol.



*Image 4: Bowman (circled in blue) and Carnell (circled in yellow) marching down Penn. Avenue*

Bowman and Carnell then proceeded to enter the restricted area on Capitol Grounds shortly after officers on the northwest stairs were overwhelmed by the violent mob and forced to retreat up to the steps. Carnell and Bowman then climbed through ripped and tattered scaffolding on the northwest side of the Capitol, as other rioters were visibly climbing on and hanging from it. The scaffolding had been erected for the upcoming inauguration of President Joseph R. Biden, Jr.



*Image 5: Bowman (wearing grey hoodie) and Carnell (wearing red baseball cap) climbing through scaffolding toward Northwest Terrace of Capitol grounds.*

Bowman and Carnell walked across the Northwest Courtyard toward the Senate Wing Door. As they walked, a group of uniformed officers were visibly protecting another entry point into the Capitol Building, the Parliamentarian Door.



*Image 6: Bowman (left) and Carnell (right), circled in red, proceeding toward Senate Wing Door, as officers (circled in green) protect Parliamentarian Door area.*

7

The Capitol Building was within the restricted area on January 6, 2021. Bowman and Carnell entered the Capitol without lawful authority through the Senate Wing Door at approximately 2:23 p.m.



*Image 7: Bowman (circled in blue) and Carnell (circled in yellow) enter the Capitol.*

Fewer than ten minutes earlier, other rioters had smashed in the windows flanking the Senate Wing Doors, rendering the windows visibly shattered. In addition, the Building's alarm system was audibly blaring as Bowman and Carnell entered the Building.

Bowman and Carnell proceeded to the Crypt area of the Capitol. They joined the crowd as it overwhelmed the USCP officers who were attempting to prevent the rioters from entering further into the Capitol.



*Image 8: Bowman (wearing sunglasses) and Carnell (wearing red baseball cap) in the Crypt.*

Testifying in the trial of another participant in the events of January 6, 2021 riot, one USCP

Lieutenant who was present for the confrontation in the Crypt described his experience as follows:

Q.   And what happened when you got into the crypt?

A.   Rioters already entered the building on the Senate side and were on the hallway on the – the north hallway coming towards the Crypt.

Q.   Did you try to stop rioters in that location?

A.   Yes. As they came down the hallway . . . we formed a police line, me and the other officers that were there formed a police line in the crypt to try to keep them from going any further.

. . .

There was a lot of yelling, screaming. Things were thrown at us. Eventually the mob pushed through the line, pushed people back. I was pushed into the hall and crushed into the wall to the point I couldn't breathe.

Q.   Were you scared?

A.   Yes.

Q.      What was going through your mind at that point?

A.      That my kids would be growing up without me.[4]

Bowman and Carnell then traveled into and through the Capitol Rotunda and joined a crowd as it amassed near the Rotunda Door. Carnell chanted "TREASON, TREASON, TREASON," while Bowman stood nearby.



*Image 9: Bowman (wearing sunglasses) and Carnell (wearing red baseball cap) during "treason" chant near the Rotunda Door.*

At 2:38 p.m., Carnell stepped forward and pushed with the mob from the inside of the East Rotunda doors in an attempt to assist other rioters regain entry to the Capitol after uniformed USCP officers had forced the doors shut. Carnell pushed for a moment, stood back and cheered once the doors were re-breached, then stepped in again to keep pushing. He stopped pushing once the mob successfully burst through the doors. Bowman stood nearby and watched.

---

[4]  *See United States v. Carpenter*, 21-cr-305 (JEB), Trial Tr. at 190:19-191:2, 192:23-193:9.



*Image 10: Bowman (wearing sunglasses and green jacket with gray hoodie) and Carnell (wearing red baseball cap) near the Rotunda Door.*

Bowman and Carnell then ascended then ascended the Rotunda Lobby East Stairs at 2:41 p.m. As Bowman admitted in his FBI interview, he and Carnell then observed other rioters physically attacking a female journalist at the top of the staircase.



*Images 11, 12, 13: Bowman (wearing sunglasses) and Carnell (wearing red baseball cap) ascending Rotunda Lobby East Stairs.*

Bowman and Carnell entered the Senate Chamber and walked onto the Senate floor at 2:49 p.m. While entering the Senate floor, one rioter loudly explained that the "chair" on the Senate dais "belongs to the Vice President of United States when he's in here," and another rioter responded, "they can steal our election but we can't sit in their chairs?!"



*Image 14: Bowman (wearing sunglasses) and Carnell (wearing red baseball cap)
entering the Senate floor at 2:49 p.m.*

When Bowman entered the Chamber, he understood that Vice President Pence and the Senators needed to "determine something that would've been very consequential for Trump–that's why things were so heated" that day; however, he believed the certification to be occurring in the House Chamber.

While they were on the Senate floor, Bowman conversed with Carnell. He also observed rioters rifling through papers on Senators' desks and took and posed for cell phone pictures and videos. Indeed, Bowman took a photograph with his cell phone when another rioter picked and held up a signed document from Senator Mitt Romney to Vice President Pence, which was a copy of Senator Romney's speech from February 2020, when he voted to impeach then-President Trump.

13

 

*Images 15, 16: Bowman (wearing sunglasses) sitting at a senator's desk (left) and photographing Senator Romney's speech (right).*

Bowman also walked nearby Carnell as Carnell looked over the shoulder and discussed documents with a man in a green combat helmet, who was rummaging through documents on a Senator's desk. Specifically, the individual with the green combat helmet stated, with regard to documents associated with Senator Ted Cruz, "He was gonna sell us out all along—look! 'Objection to counting the electoral votes of the state of Arizona.'" Carnell then responded, "Wait, no. That's a good thing. He's on our side. He's with us. He's with us."



*Image 17: Bowman (circled in blue) and Carnell (circled in yellow) during discussion of Senator Cruz's objection to certification of Arizona's electoral votes.*

Bowman also took a paper drink coaster, bearing the seal of the United States Senate, from a desk on the Senate floor. Bowman brought the coaster to his home in Raleigh, North Carolina.

At or around 2:55 p.m., Bowman and Carnell left the Senate Chamber. They were directed to exit the Capitol by uniformed law enforcement officers, and left the Capitol through the Senate Carriage Door at 2:56 p.m.

At 4:19 p.m., Carnell sent a text message to the group that stated, "We're safe heading home." Bowman responded with a photoshopped image of himself shaking hands with far-right social media figure Nick Fuentes in front of what appears to be a video game-created version of the Capitol engulfed in flames.



*Image 18: Image of Nick Fuentes (left) and Bowman (right) that was sent by Bowman*

On January 7, 2021, Bowman sent the group an image of the letter from Senator Romney to Vice President Pence that he photographed while on the Senate floor.



*Image 19: Photo, taken by Bowman on the Senate floor, that he sent to the group.*

16

On January 8, 2021, at 2:19 p.m., Bowman texted the group a link to a news story including an image taken from the Senate floor on January 6, 2021. He then wrote "please delete this group text. It would be so funny if you all deleted this as a funny ironic joke."

Bilyard responded, "did you get inside? Hypothetically speaking." Another individual then sent a computer-generated picture of the U.S. Capitol Building and asked, "did you get inside this cool Minecraft Building?" Bowman replied, "if I was buying textbooks for next semester, I would have hypothetically gotten into the book store and even walk[ed] the checkout floor where all the professors usually buy books and sometimes choose what books their students would read. But no that was just a joke delete the chat because it's funny." Bilyard then texted the group, "so what you're saying is that you got into a private library of sorts," to which Bowman responded, "In Minecraft school yes[.] But no[.] Delete all of this for fun."





*Image 20: Image of text message exchange between Bowman and the group (Bowman's texts are shown on the left side of the exchange).*

Bowman deleted images from his cell phone approximately one year after January 6, 2021.

### ***Bowman's Interview With the FBI***

On March 2, 2022, Bowman agreed to be interviewed by FBI Task Force Officers regarding his conduct on January 6, 2021. He admitted to entering the Capitol (including the Senate Chamber) and identified himself and Carnell from images presented to him. Bowman admitted taking a Senate drink coaster, retrieved the coaster, and gave it to the FBI. Bowman also stated that he had deleted images from his phone approximately one year after January 6, 2021. The FBI

considered Bowman's statements to be forthright. Bowman's positive identification of Carnell and the statements that he made to the FBI were relied upon, in part, for probable cause in FBI's Statement of Facts to support arresting Bowman and Carnell in this case. *See* ECF No. 1-1 at 9-10.

## III.   THE CHARGES AND STIPULATED TRIAL

On April 26, 2023, a federal grand jury returned an indictment charging Bowman with six counts: Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One); Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six). *See* ECF No. 22.

On February 12, 2024, Bowman was convicted of those offenses as the result of a stipulated trial. He admitted an extensive factual basis that supported his conviction. *See* ECF Entry, 2/12/24.

## IV.   STATUTORY PENALTIES

Bowman now faces sentencing on all six counts in his Indictment. As noted by the Presentence Report issued by the U.S. Probation Office, the statutory maximum term of imprisonment is 20 years on Count One; one year each on Counts Two and Three; and six months each on Counts Four, Five, and Six. PSI ¶¶ 111-13.

The maximum term of supervised release is three years for Count One and one year for

Counts Two and Three. PSI ¶¶ 120-21. The maximum fine is $250,000 for Count One; $100,000

for Counts Two and Three; and $5,000 for Counts Four through Six. PSI ¶¶ 142-44. Mandatory

special assessments total $180. PSI ¶¶ 145-47.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). The government concurs with the U.S. Probation Office's assessment of the appropriate

offense level and guideline that applies to Bowman's violation of 18 U.S.C. § 1512(c)(2), [5] which

matches the calculation provided by the United States.[6] *See* ECF No. 86. The United States'

proposed Guidelines analysis for each Count of conviction follows:

---

[5] The PSI does not include a Guidelines analysis for all Counts to which Bowman was convicted. *See* PSI ¶¶ 46-65. Sections 1B1.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSI does not follow these steps. It concludes (*see* PSI ¶ 56) that Counts One, Two, and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). However, because this error is not material to the Guidelines range that applies, the United States has not objected.

[6] The government notes the D.C. Circuit recently decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024), which held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id.* at *8. However, as described below, departures, such as those under Chapter 5, Part K, may nonetheless be appropriate, or a variance from the applicable guidelines range may be warranted.

### A. Guidelines Analysis for Each Count

**Count One: 18 U.S.C. §§ 1512(c)(2) and 2—Obstruction of an Official Proceeding and Aiding and Abetting**

The Statutory Appendix lists one guideline for a Section 1512(c) offense, U.S.S.G. § 2J1.2 (Obstruction of Justice).

| Base Offense Level: | 14 | U.S.S.G. § 2J1.2(a) |
|---|---|---|
| Total | 14 | |

**Count Two: 18 U.S.C. § 1752(a)(1)—Entering or Remaining in a Restricted Building or Grounds**

The Statutory Appendix lists two potentially applicable guidelines for a Section 1752 offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2B2.3, which applies to trespass offenses, is the most appropriate guideline for 18 U.S.C. § 1752(a)(1), which is essentially a trespass offense.

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) (trespass) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted buildings or grounds." On January 6, 2021, the U.S. Capitol and its grounds were restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross-Reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above."<br><br>As described above, Bowman entered the restricted area of the Capitol building for the purpose of obstructing the |

| | | |
|---|---|---|
| | | official proceeding, in violation of 18 U.S.C. § 1512(c)(2). |
| Base Offense Level (adjusted) | 14 (from Count One) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." <br><br> As described above, Bowman entered the restricted area of the Capitol building for the purpose of obstructing the official proceeding, in violation of 18 U.S.C. § 1512(c)(2), thus the substantive offense is Count One and the § 2J1.2 guideline should be used. |
| Total | 14 | |

**Count Three: 18 U.S.C. § 1752(a)(2)—Disorderly or Disruptive Conduct in a Restricted Building or Grounds**

The Statutory Appendix lists two potentially applicable guidelines provisions for a Section 1752 offense: U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2A2.4, which applies to impeding officers, is the most appropriate guideline for 18 U.S.C. § 1752(a)(2), which prohibits "disorderly or disruptive conduct" and involves more than mere trespass (making § 2B2.3 an inappropriate guideline for the offense conduct).

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) (Obstructing or Impeding Officers) |
| Total | 10 | |

**Counts Four through Six: 40 U.S.C. §§ 5104(e)(2)(A), (D) and (G)—Entering and Remaining on the Floor of Congress, Disorderly or Disruptive Conduct in a Capitol Building and Parading, Demonstrating, or Picketing in a Capitol Building**

Because these offenses are Class B misdemeanors, the Guidelines do not apply to them. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

### B.  Grouping Analysis

Under U.S.S.G. § 3D1.2, "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction … [or] (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline appliable to another of the counts." The government agrees with the U.S. Probation Office that Bowman's counts of conviction should be placed into one group. PSI ¶ 56.

### C.  Application of § 4C1.1

Amendment 821 to the Sentencing Guidelines, effective November 1, 2023, created a new guideline, U.S.S.G. § 4C1.1. Section 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not considered at the time the government estimated the Guidelines range that applies to this case. *See* ECF No. 86. The Government concedes that Section 4C1.1 applies to Bowman.

### D. Estimated Guideline Range

The U.S. Probation Office calculated Bowman's criminal history as category I, which is not disputed. PSI ¶ 68. Accordingly, based on the government's calculation of Bowman's total adjusted offense level, after acceptance of responsibility and with application of U.S.S.G. § 4C1.1, at 10, Bowman's Guidelines imprisonment range is 6 to 12 months' imprisonment.[7]

### E. Upward Departure or Variance

The government requests that the Court depart or vary to reflect Bowman's obstruction of the electoral college certification proceedings.

After determining the defendant's Guidelines range, a court considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Following *Brock*, the enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) no longer apply. But that decision does not undercut the severity of Bowman's crime – invading the Capitol in an attempt to stop Congress from certifying the election. *See Brock*, 2024 WL 875795, at *15 ("interference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work"). In order to impose a just and fair sentence in this case, the Court should either (1) impose an upward departure pursuant to U.S.S.G. § 5K2.7, resulting in a Guidelines range of 12 - 18 months' imprisonment, or (2) vary upwards to sentence Bowman to

---

[7] Bowman has objected to PSI ¶ 42 on the basis that he allegedly was "substantially less culpable than the average participant." However, that adjustment does not apply because he is considered to be a solo offender for the offenses of his conviction; this is not a conspiracy case. *See* U.S.S.G. § 3B1.2, cmt. n.2 ("This guideline is not applicable unless more than one participant was involved in the offense"). Regardless, Bowman was not "substantially less culpable than the average participant in the criminal activity." *Id.*, cmt. n.3(A).

15 months' imprisonment, above his current Guidelines range but still within the pre-*Brock* Guidelines range.[8]

Prior to the D.C. Circuit's ruling in *Brock*, this Court found that the offense characteristic set forth in Section 2J1.2 covered congressional proceedings, and that the actions of individuals who obstructed the certification on January 6, 2021 "sit firmly in the category of serious offense conduct which the Sentencing Commission determined merited greater punishment." *United States v. Rubenacker*, 21-cr-193 (BAH), Sentc'g Tr. 5/26/22 at 79. However, the Court stated that it would have applied a corresponding variance or departure if Section 2J1.2 did not cover congressional proceedings. The Court explained,

> Where conduct significantly differs from the norm, the Court is not limited by what is provided in the guidelines but may, in such unusual cases, impose a sentence outside the recommended sentencing range. And what happened on January 6, 2021, was outside the norm and outside the heartland of cases – in fact, the first time in our history where the peaceful transition of power to a new administration was disrupted by mob action attacking the Capitol.

> So even if defendant were correct … that the SOCs in the guideline 2J1.2 did not cover congressional proceedings, these SOCs capture specific harms warranting an increase in sentence severity, like causing or threatening physical harm to another person or so interfering with a proceeding as to result in the unexpected expenditure of substantial government resources; and those specific harms may, by analogy, apply equally to the offense conduct that occurred against our legislative branch of government on January 6, 2021, and warrant corresponding increases in the severity of the sentence by way of a departure or a variance.

*Id.* at 80-81.

---

[8] Applying the enhancement in U.S.S.G. § 2J1.2(b)(2) to the instant case would result in an offense level of 17. After application of Section 4C1.1, the offense level becomes 15, which would then be decreased an additional two levels for acceptance of responsibility, totaling 13. Accordingly, the pre-*Brock* Guidelines range would have been 12-18 months' imprisonment.

A "district court's authority to impose a departure emanates from 18 U.S.C. § 3553(b)(1) and, in turn, in Chapter 5, Part K of the Guidelines." *United States v. Jacobs*, 635 F.3d 778, 781-82 (5th Cir. 2011). This part of the Guidelines "identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range," which may warrant a departure. U.S.S.G. § 5K2.0(a)(2)(A).

One such circumstance is when an offense results in "a significant disruption of a governmental function." U.S.S.G. § 5K2.7.[9] A departure under this guideline is warranted in "unusual" circumstances where the Guidelines do not reflect the appropriate punishment for the offense. *Id*. In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

Although the general rule is that Section 5K2.7 does not provide for an upward departure when the offense involves obstruction of justice, the obstruction of the Electoral College certification on January 6, 2021 is the exact type of unusual circumstance that the Sentencing Commission could not have predicted and that warrants an upward departure. Those who obstructed the administration of justice that day targeted the peaceful transfer of power, one of the fundamental and foundational principles of our democracy. They were part of a mob that injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. Defendants like Bowman "endanger[ed] our democratic processes and temporarily derail[ed]

---

[9] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765-66, 771 (D.C. Cir. 2011).

Congress's constitutional work." *Brock*, 2024 WL 875795, at *15. It was an unprecedented day in American history. But, following *Brock*, the seriousness of the crimes committed for defendants like Carnell is not adequately captured by the applicable Guideline, Section 2J1.2, because the Sentencing Commission did not contemplate that an event like January 6 could happen when it wrote the Guidelines. This Court has already applied Section 5K2.7 in a January 6 case. *See United States v. Eicher*, 22-cr-38 (BAH), Sentc'g Tr. 9/15/23 at 50 (applying Section 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours").

If the Court decides not to apply Section 5K2.7, an upward variance is warranted to achieve an appropriate sentence under the Section 3553(a) sentencing factors. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308-09 (D.C. Cir. 2018) (cleaned up).

Here, as the Court explained in *Rubenacker*, an upward variance is warranted to account for the unique nature and circumstances of the offense and to reflect the seriousness of the offense. As just discussed, Bowman's obstruction of justice on January 6 was a serious offense that attacked the fundamentals of American democracy. The only reason that Bowman is not subject to additional levels' worth of enhancements in § 2J1.2 is because the Sentencing Commission did not imagine that a day like January 6 could occur. As Judge McFadden stated in a pre-*Brock* sentencing hearing:

> Regardless of whether the 'administration of justice' language actually applies to this situation, *I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding...* [Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources.

*United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sentc'g Tr. 9/22/22 at 86-87 (emphasis added).

In the specific facts and circumstances of Bowman's case (discussed in more detail below), an upward variance to 15 months' incarceration is appropriate. *See United States v. Reffitt,* 21-cr-87 (DLF), Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'); *United States v. Fonticoba*, 21-cr-368 (TJK), Sentc'g Tr. 1/11/24 at 66-67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *Fonticoba*, 4/11/2024 Mem. Order at 4-5 (denying motion for release pending appeal and agreeing that certification proceeding was "far more important" than "any run-of-the-mill" judicial or quasi-judicial proceeding); *see also United States v. John Sullivan*, 21-cr-78 (RCL) (May 1, 2024 Sentc'g) (transcript not yet available) (finding post-*Brock* guidelines did not fully encompass the sentence warranted where the defendant was an agent of chaos and hid behind the "protective veneer" of journalism, among other things). Accordingly, the government requests that the Court vary or depart upwards and sentence Bowman to 15 months' imprisonment, in order to give effect to "the concerns underlying the Government's requests for these enhancements under

the § 3553(a) factors at sentencing." *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a). The Section 3553(a) factors weigh in favor of a term of incarceration of 15 months.

### A.    Nature and Circumstances of the Offense

As discussed in Section II(B) of this memorandum, Bowman's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. On January 6, 2021, Bowman was no mere spectator; in fact, he was part of the mob that entered the Capitol within the first ten minutes of its breach, overwhelmed officers in the Crypt and at the Rotunda Door, and observed an assault on a journalist. He was one of the few rioters who breached the Senate Chamber and occupied the floor. As this Court has previously explained in sentencing two other defendants who entered the Senate floor:

> These are not defendants who simply walked in, walked around, and walked out of the Capitol Building during their 25 minutes unlawfully inside the Capitol Building. This really underestimates and understates the seriousness of the offense conduct to my mind. They are among the very few rioters who went and breached the Senate Chamber. And they didn't just walk into the Senate Chamber, see a "members only" sign, turn around and walk out. You can see on the videotapes, even in this case, that there were some people who went in and went: Whoa, look where we are, oh, my goodness, then turned around and walked out. Not these defendants.
>
> They walked in, and they spent some time there. They walked all around the Senate Chamber. They looked through papers on the Senate Chamber floor. This … is one of the more sensitive spaces in the Capitol. This differentiates their offense conduct from 90 percent of the defendants connected to the January 6 riot at the U.S.

Capitol.

*United States v. Bender*, 21-cr-508 (BAH), Sentc'g Tr. 4/20/23 at 104-05. "[L]ess than an hour before the defendants and others had barged into the Senate Chamber, senators were in that very room certifying the 2020 presidential election." *Id.* at 107. The nature and circumstances of Bowman's offenses thus were of the utmost seriousness, and fully support the government's recommended sentence of 15 months' imprisonment.

### B.  The History and Characteristics of the Defendant

The defendant is a part time college student. He has no reported arrests and no criminal convictions prior to this case. Although his young age and lack of criminal history may be considered as mitigating factors under Section 3553(a), they are somewhat counterbalanced by the defendant's susceptibility to peer pressure or radicalization. In addition, Bowman sent text messages to the group that involved firearms. Therefore, in advance of January 6, he contemplated violence.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Bender's criminal conduct on January 6 was the epitome of disrespect for the law. As the Court explained in sentencing Luke Bender and Landon Mitchell, who also invaded the Senate floor on January 6, 2021:

> To promote respect for the law, that's a good reminder here, too, because this was not just any, you know, obstruction of any proceeding, this was a constitutionally mandated one. So interrupting this was not just respect for local municipal ordinance, this is for a constitutional requirement for a democracy.

*United States v. Bender*, 21-cr-508 (BAH), Sentc'g Tr. 4/20/23 at 102.

### D.    The Need for the Sentence to Afford Adequate Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

As the Court explained during the sentencing of Luke Bender and Landon Mitchell, "[i]t is, to me, very important for both specific deterrence and general deterrence that people know, if they are illegally on the Senate Floor and you are caught, you do go to jail, particularly in the midst of a riot when you are interrupting a constitutionally mandated process necessary for the peaceful transfer of power." *Id*. at 109. A sentence of imprisonment thus is essential to promote the deterrence factor set forth in Section 3553(a)(2)(B).

### E.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

31

ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

Although all the other defendants discussed below participated in the Capitol breach on

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Sentc'g Tr. 8/26/22 at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

January 6, 2021, many salient differences explain the differing recommendations and sentences.[12] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The most apt comparator to Bowman is his co-defendant, Carnell. Bowman's pre and post January 6 statements were more inflammatory than Carnell's: in November 2020, as a group text message chain of which he was a part contemplated a Stop-the-Steal-related trip to D.C., Bowman sent one picture text of himself holding a firearm and another picture text of a handful of other firearms. Then, following January 6, Bowman expressed satisfaction regarding his conduct at the Capitol via text message, including proudly sending a picture text of a photo taken from the Senate floor. However, Carnell's conduct itself was more aggravated. First, it was Carnell who instigated the trip to D.C. for January 6. He was the one who forwarded to the group a message referencing "flooding" D.C. "with Patriots who will loudly tell Congress #DoNotCertify on #Jan6!" Then, on January 6, Carnell more actively participated in overtaking the Capitol Building: he took videos and/or photos and was visibly excited when officers were overwhelmed in the Crypt; he enthusiastically joined a "treason" chant while pumping his fist just inside the East Rotunda Doors; he physically pushed other rioters who were pushing officers to attempt to re-open the East Rotunda Doors; then, he cheered once the mob succeeded in getting those doors re-opened; and,

---

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

finally, after entering onto the Senate floor, he actively reviewed documents relating to the Electoral College vote count and discussed them with other rioters. Carnell participated in and threatened violence on that day. In addition, following January 6, Bowman was cooperative and aided the government by admitting his conduct and identifying his co-defendant in December 2022, before any charges were filed. Carnell was not cooperative. For this reason, Carnell's conduct was more aggravated than Bowman's. The government therefore has requested a 15-month sentence for Bowman and an 18-month sentence for Carnell.

Other than his co-defendant, Bowman's case is most analogous to that of January 6 defendant Luke Bender. *See United States v. Bender*, 21-cr-508 (BAH). Like Bowman and Carnell, Bender and Landon Mitchell were friends who traveled together to the rally on the Ellipse. They marched to the Capitol, climbed through scaffolding, and trekked through the Capitol before entering the Senate floor. Like Bowman, Bender sat at a senator's desk and posed for pictures. He also was young– just 20 years old – on January 6, 2021. Following the events of January 6, Bender similarly deleted photographs from his cell phone. He also sought lenience at sentencing based upon a spectrum disorder. But there are some differences in the two cases: Bender was in the Capitol for about half the time as Bowman and was not part of the mob that overwhelmed officers in the Crypt and near the Rotunda Door. Bender celebrated his own unlawful conduct and that of others in his social media accounts, and had a Criminal History Category of III due to prior convictions. After Bender was found to be guilty of six offenses at a stipulated trial, the Court applied a base offense level of 14 to his 18 U.S.C. § 1512(c)(2) conviction, pursuant to U.S.S.G. § 2J1.2(a). Prior to the D.C. Circuit's *Brock* decision, it applied a three-level adjustment for

interfering with the administration of justice under U.S.S.G. § 2J1.2(b)(2). Based on his Criminal History Category of III, Bender's Guidelines range was 21 to 27 months. The Court sentenced him to a 21-month term of imprisonment, a three-year term of supervised release, $2,000 in restitution, and the $180 mandatory special assessment.

Bowman's case is also similar to that of Michael Lee Roche. *See United States v. Roche*, 22-cr-86 (BAH). Roche entered the Capitol through Parliamentarian door, traveled through the Building for about 15 minutes, was part of crowd that pushed past officers near North Door Appointment Desk, and entered Senate floor at 3:03 p.m. He went to Vice President's desk and remained in the Senate Chamber for seven minutes. Roche shouted, prayed, and posed for photos before he was removed from Capitol at 3:10 p.m. Roche thus was in the Capitol for less time than Bowman, but ascended the dais. Like Bowman, Roche had a Criminal History Category of I. After he was convicted of six offenses at a stipulated trial, the Court determined that Roche's total offense level was 14 (including the § 2J1.2 enhancement invalidated by *Brock*), resulting in a Guidelines range of 15 to 21 months' imprisonment. The Court sentenced Roche to 18 months' imprisonment, 36 months of supervised release, and $2,000 in restitution.

Finally, the Court may wish to consider January 6 defendant Christine Priola. *See United States v. Priola*, 22-cr-242 (TSC). There, the defendant pleaded guilty to 18 U.S.C. § 1512(c)(2). Like Bowman, Priola made her way to the Senate floor. While on the Senate floor, Priola spoke to an associate by telephone and encouraged that person to come inside either the Capitol building or into the Senate Chamber, saying it was "now or never." Like Bowman, Priola deleted from her cellular telephone photos, videos, chats, and messages regarding her activities on and around

January 6. With a total offense level of 14 and Criminal History Category of I, Priola's guidelines range was 15 to 21 months, prior to the decision in *Brock*. Judge Chutkan sentenced her to 15 months' incarceration.

To the extent that the Supreme Court's forthcoming *Fischer* decision undermines Bowman's felony conviction under 18 U.S.C. § 1512(c), the government would seek a consecutive sentence of the remaining offenses so that the Court's sentence would be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a). That is, the sentence imposed by the Court still should fully reflect the obstructive conduct of the defendant through the application of consecutive sentences as permitted by 18 U.S.C. § 3584(b) and U.S.S.G. § 5G1.2(d).

Accordingly, a sentence of 15 months would not create an unwarranted sentencing disparity.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110

Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full

restitution without respect to a defendant's ability to pay.[13]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his] individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Bowman to pay $2,000 in restitution for his

---

[13] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

convictions on Counts One through Six. This amount fairly reflects Bowman's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court depart or vary upwards to sentence David Worth Bowman to 15 months of incarceration; three years of supervised release; $2,000 in restitution; and a $180 mandatory special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney
Tax Division, U.S. Department of Justice
Detailed to the U.S. Attorney's Office
P.O. Box 55, Washington, D.C. 20044
Jordan.A.Konig@usdoj.gov
Tel.: 202-305-7917

SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov